A97A2419. NEW MADISON SOUTH LIMITED PARTNERSHIP
et al. v. GARDNER.
(499 SE2d 133)

BEASLEY, Judge.

Frederick Gardner sued appellant apartment owners and managers seeking damages he sustained allegedly as a result of conduct by John Hales, an employee of appellants. Gardner did not sue Hales. Appellants enumerate as error the denial of their motion for summary judgment in which they claim they are not liable for Hales' actions when he shot and paralyzed Gardner. They rely on three grounds: (1) Hales' actions were outside the scope of his employment; (2) appellants took reasonable steps to determine Hales' competence before hiring him; (3) appellants, as owners or occupiers of property, owed no duty to Gardner because he was shot after he left the property and was no longer an invitee. The applicants' interlocutory appeal was granted.

Construing the evidence most strongly against appellants, Hales was the "courtesy officer" of the New Madison Apartments (Madison), and appellants are the owner/managers of Madison and Hales' employer.[1] Madison is an affordable housing complex for low-income individuals located in Savannah. Hales' duties were to enforce the rules and regulations, handle loitering, "patrol the grounds, report any illegal activity (and) report to management any concerns about

---

[1] No distinction is made between appellants on appeal, and all are treated as Madison's owner/manager and Hales' employer. For the purposes of appeal they are treated collectively.

residents." He also had the duty to "walk the property" and was told to take "appropriate action" in response to a problem. Hales was a tenant at Madison. Gardner lived at his girl friend's apartment at Madison and had for some time. Gardner had known Hales for several years.

On Friday night March 11, 1994, Gardner came home from work at 5:00 p.m. and relaxed on the porch of his girl friend's apartment drinking Colt 45 Malt Liquor. By 11:00 p.m. he had consumed at least three twenty-two-ounce bottles and was playing music on his radio. Hales approached Gardner at about 11:00 p.m. and, because playing loud music was prohibited at Madison at this hour, asked him to turn down the radio. Gardner went inside, reduced the volume, and returned to the porch.

Gardner was carrying in his jacket pocket, without a license, a .25 caliber automatic pistol. Hales also carried a gun, but Gardner did not notice it. Heated words were exchanged. Gardner testified he said something about Hales' wife and became angry because Hales said things about him and his girl friend. Hales did not threaten Gardner in any way and left without further incident.

On Saturday morning, at approximately 10:00 a.m., Hales reported the event to Winnetta Carter, the resident manager. She told Hales she would take care of the matter. There is no evidence that Gardner violated any Madison rule or regulation of which Hales was aware after the music was turned down or on Saturday morning.

Shortly after speaking with Carter, Hales was near Gardner's girl friend's apartment talking to an acquaintance when Gardner came out. Both men were armed. Gardner approached Hales and said "John, me and you need to talk and try to iron out these differences and stuff like that." He later contended he was trying to make up with Hales. Gardner testified that Hales said "we'll iron it out, but we'll iron it out outside of Madison," and Gardner replied "ok." He understood that the differences between them were to be resolved in some other location. Gardner testified that Hales said nothing more, did not threaten him, got in his vehicle, drove off the Madison property and parked near the pool at the neighboring Allen Apartments, which appellants do not own or manage.

Gardner walked from the Madison toward the Allen apartments with his gun in his jacket pocket on the way to the store. He saw Hales and approached him. The two men confronted one another on the grounds of the Allen Apartments and/or in the adjacent street. Hales shot Gardner four times, paralyzing him from the waist down.

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of

law. OCGA § 9-11-56 (c)."[2]

1. *Scope of Employment/Respondeat Superior*

"A master is liable for the willful torts of his servant, committed in the course of the servant's employment, just as though the master had himself committed them."[3] This includes a wilful and unjustified assault,[4] and incidents where the servant evinced anger, malice or ill will toward the victim.[5]

But if the injurious act is not within the class of activities performed on behalf of the employer, the employer is not bound.[6] "If a servant steps aside from his master's business to do an act entirely disconnected from it, and injury to another results from a doing of the act, the servant may be liable, but the master is not liable."[7] "Thus, the test of liability is whether the tort was done within the scope of the actual transaction of the master's business for accomplishing the ends of his employment."[8] The test is not strictly dependent on whether the incident occurred during the time covered by the employment[9] or at the place of business.[10]

"Whenever there is a mingling of personal motive, and performance of duties of his employer in the doing of any act by a servant, a jury question is created as to whether or not there is a deviation from employment, and if so, whether the deviation was so slight as not to affect the master's responsibility for the servant's act."[11] These motives may be mingled where the employee has been provoked by harsh words related to the manner and method in which he performed his duties.[12]

"The question whether or not the servant at the time of an injury to another was acting in the prosecution of his master's business and

---

[2] *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

[3] (Punctuation omitted.) *Nordmann v. Intl. Follies*, 148 Ga. App. 77, 78 (2) (250 SE2d 794) (1978). See also OCGA § 51-2-2.

[4] *Broome v. Primrose Tapestry Mills*, 59 Ga. App. 70, 74 (200 SE 506) (1938); *Minnesota Mining &c. Co. v. Ellington*, 92 Ga. App. 24, 28 (87 SE2d 665) (1955).

[5] *Davis v. Childers*, 134 Ga. App. 534, 536 (6) (215 SE2d 297) (1975). See *Bacon v. News-Press & Gazette Co.*, 188 Ga. App. 703, 704 (373 SE2d 797) (1988) (simple presence of a personal motive does not exonerate the employer if the servant is acting in the line of his duty and the prosecution of his master's work).

[6] Id. at 705.

[7] (Citations and punctuation omitted.) *Smith v. Myrick*, 205 Ga. App. 339, 340 (422 SE2d 236) (1992).

[8] (Citations and punctuation omitted.) Id.

[9] *Jump v. Anderson*, 58 Ga. App. 126, 128 (197 SE 644) (1938); *Southern Bell Tel. &c. Co. v. Sharara*, 167 Ga. App. 665, 667 (307 SE2d 129) (1983) (an employee may deviate from the scope of employment during the hours of employment).

[10] See *Greenfield v. Colonial Stores*, 110 Ga. App. 572, 575 (139 SE2d 403) (1964) (employees pursued plaintiff to another store where assault occurred).

[11] *Davis*, supra, 134 Ga. App. at 535 (4).

[12] See *Miller v. Honea*, 163 Ga. App. 421, 422 (294 SE2d 629) (1982); *McCranie v. Langdale Ford Co.*, 176 Ga. App. 281, 283 (335 SE2d 667) (1985).

in the scope of his employment is for determination by the jury, except in plain and indisputable cases."[13]

There is no evidence, direct, circumstantial or inferential, that Hales' actions off Madison property in shooting Gardner were done within the scope of the actual transaction of any of Madison's business for accomplishing the ends of his job. After the Friday night incident, the only further action taken by Hales with regard to the loud music was to report the incident to Carter. Hales coincidentally encountered Gardner on the Madison property thereafter but took no official action, enforced no rules, and spoke only of their personal business. There is no evidence that Hales was aware of any rule violations by Gardner at that time. Hales did not threaten Gardner and he left the Madison property. There is no evidence he was on duty when he left. The only evidence of provocation was purely personal statements made by the two men about each other's wife or girl friend, totally unrelated to Hales' performance as a courtesy officer.

There was not even evidence of mingling of personal motives and performance of duties. It is undisputed that Hales stepped aside from Madison's business when he left the property after taking no further action involving Gardner while on the property. Both of them deliberately left to resolve their dispute beyond its borders.

Gardner argues that Hales' own testimony shows he was acting within the scope of his duties when he stated that he was instructed by his supervisor to handle matters "the way you see fit." Even if this testimony is admissible, a jury could not reasonably infer that this instruction authorized re-initiation of a personal matter off the premises in a violent manner. Hales had full opportunity to take any other official action necessary to accomplish his job when he spoke to Gardner earlier Saturday morning, yet he did nothing. The location of the incident, the subject matter, the time of the incident, and Hales' actions were outside the scope of employment.

In a separate lawsuit arising out of the same incident, Hales' allegation that his actions "[arose] out of the performance of his duties as a security guard" are not verified and are insufficient to create an issue of fact. Gardner contends Hales admitted in a deposition in that suit that he was still patrolling on Saturday after he reported the Friday night incident to Carter. First, the deposition is not in the record. Second, the cited testimony does not allow an inference that Hales continued to "patrol" when he left the Madison property.

Comparable to this case are *Rogers v. Fred R. Hiller Co. &c.*, 214 Ga. App. 448 (1) (448 SE2d 46) (1994) (summary judgment for employer appropriate where no reasonable construction can be

---

[13] *Jump*, supra, 58 Ga. App. at 128. See *Bacon*, supra, 188 Ga. App. at 704.

drawn except servant's actions were personally motivated even though during work hours in middle of meeting); *Worstell Parking v. Aisida*, 212 Ga. App. 605, 606 (1) (442 SE2d 469) (1994) (assault by parking attendant motivated purely by personal matters and not for any purpose beneficial to owner); and *Big Brother/Big Sister &c. v. Terrell*, 183 Ga. App. 496, 498 (3) (359 SE2d 241) (1987) (actions of servant not in furtherance of the master's business where servant abandons master's business and pursues own sexual desires). Compare *Bacon*, supra, 188 Ga. App. at 704 (master may be liable where servant improperly used gun in violation of company policy if act done in pursuit of master's business); *Minnesota Mining*, supra, 92 Ga. App. 24 (issue of fact as to whether employee's actions were within scope of employment where manager of company softball team assaulted stranger who walked across field and some testimony showed he was angry because stranger was slow to leave).

*Odum v. Hubeny, Inc.*[14] and *Gilbert v. Progressive Life Ins. Co.*[15] are distinguishable. In *Odum*, the altercation was in the restaurant and may have started as part of the employee's attempts to get the patrons to leave. In *Gilbert*, the altercation occurred on the premises, and there was no evidence that the employee stepped aside from his employer's business.

Denial of summary judgment on this issue was error.

2. *Negligent Hiring and Retention*

"An examination of the cases dealing with negligent hiring reveals that in each instance, at the very least the tortious act occurred during the tortfeasor's working hours or the employee was acting under color of employment. [Cits.]"[16] "[T]he holding in *Lear Siegler* acts to shield employers from liability for those torts his employee commits on the public in general."[17]

There is an exception to this rule which provides that the theory of negligent hiring/retention applies even if the tort was committed outside the scope of employment where there is a special relationship such as landlord-tenant between the tortfeasor and the victim and the tortious conduct arises out of the relationship.[18]

An invitee stands in the shoes of a tenant "insofar as they suffer injury due to the negligence of the owner or occupier of the premises."[19] Even assuming Gardner was an invitee and not a licensee and

---

[14] 179 Ga. App. 250 (345 SE2d 886) (1986).

[15] 79 Ga. App. 219 (53 SE2d 494) (1949).

[16] *Lear Siegler, Inc. v. Stegall*, 184 Ga. App. 27, 28 (360 SE2d 619) (1987).

[17] *Harvey Freeman & Sons, Inc. v. Stanley*, 259 Ga. 233, 234 (1) (378 SE2d 857) (1989).

[18] Id. See also *Henderson v. Nolting First Mtg. Corp.*, 184 Ga. 724, 733-739 (2) (193 SE 347) (1937) (employer may be liable for negligent selection even if the tort was not committed in the scope of employment).

[19] *Davis v. Garden Svcs.*, 155 Ga. App. 34, 35 (1) (270 SE2d 228) (1980); *Brown v. Clay*, 166 Ga. App. 694, 695 (305 SE2d 367) (1983).

that *Brown* and *Davis* apply, *Harvey Freeman* is not applicable because Gardner had abandoned his position as invitee at the time of the tort. Gardner testified he voluntarily left the premises to go to the store. He was not on Madison premises when the confrontation occurred. He had no special relationship with appellants when he was shot. Even if appellants were negligent in hiring or retaining Hales, their actions were not, as a matter of law, the proximate cause of Gardner's injuries. With regard to appellants, at the time he was shot Gardner was merely a member of the general public. For these reasons and because Hales was acting outside the scope of employment, Gardner cannot claim his damages resulted from negligent hiring or retention, and defendants were entitled to summary judgment in this regard as well.

3. *Premises Liability*

Appellants' final enumeration of error is that summary judgment should have been granted on Gardner's claim of failure of appellants to exercise ordinary care to keep the premises safe because Gardner abandoned his status as invitee when he left Madison before the shooting. It is true as Gardner points out that appellants failed to raise this precise issue below. Nevertheless, an owner or occupier of property is not liable for acts of agents that occur off the premises unless the owner or occupier authorizes or ratifies the action.[20] Gardner voluntarily left the Madison premises prior to the fateful encounter with Hales. There is no evidence appellants authorized or ratified any of Hales' actions prompted by a personal dispute after he left the premises that Saturday morning.

The trial court erred in denying summary judgment to the defendants.

*Judgment reversed. McMurray, P. J., and Smith, J., concur.*

DECIDED MARCH 18, 1998 —
RECONSIDERATION DENIED MARCH 31, 1998

*Forbes & Bowman, Morton G. Forbes, Johnny A. Foster, Scot V. Pool*, for appellants.

*Savage, Herndon & Turner, Robert B. Turner, Robert S. Kraeuter, Shivers & Associates, Wayne C. Wilson, Howard E. Alls*, for appellee.

---

[20] *Greenfield v. Colonial Stores*, supra, 110 Ga. App. at 574.